## CHARLESTON.

BOARD OF EDUCATION OF PARKERSBURG DISTRICT *et al. v.*
COUNTY COURT OF WOOD COUNTY *et al.*

(No. 5931)

Submitted April 20, 1927.     Decided June 7, 1927.

Rehearing Denied, With Modifications, July 12, 1927.

1. COUNTY COURTS—*County Court May Sell Bridge Stock Purchased for Magisterial District's Benefit (Code, c. 39, § 24, chapter 43, § 156).*

   A county court has authority, under Section 24, Chapter 39, and Section 156, Chapter 43, Code, to make sale of stock in a bridge company purchased by it for the benefit of a magisterial district in accordance with said Section 24, Chapter 39.  (p. 83).

   (Schools and School Districts, 35 Cyc. p. 923.)

2. SAME—*Evidence Held to Require Setting Aside County Courts Sale at Par of Bridge Stock, if Party Will Execute Upset Bid of Three Times Par Within Reasonable Time.*

   A case in which the sale by the county court of such stock is set aside upon condition that one of the parties to the suit, who offers by way of an upset bid three times the price received for the stock by the county court, will execute his bid within a reasonable time.  (p. 92.)

   (Schools and School Districts, 35 Cyc. p. 923.)

   (NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

MILLER, JUDGE, absent.

Appeal from Circuit Court, Wood County.

Suit by the Board of Education of Parkersburg District and others, citizens and taxpayers, against the County Court of Wood County and others to cancel a sale of stock of the Parkersburg-Ohio Bridge Company, belonging to the school district. From a decree of dismissal, plaintiffs appeal.

*Reversed on condition.*

104 W. Va.

*Kreps, Russell, Hiteshew & Adams* and *Brown & McIntire,*
and *J. Bernard Handlan,* for appellants.

*Smith D. Turner, Robert B. McDougle, Ambler, McCluer &
Ambler, F. C. Fisher* and *C. M. Hanna,* for appellees.

LITZ, JUDGE:

This is a suit in chancery by the Board of Education of
Parkersburg Independent School District and a number of
citizens and taxpayers of the District of Parkersburg against
the County Court of Wood County and others, to cancel the
sale of 1,750 shares of the capital stock of the Parkersburg-
Ohio Bridge Company, belonging to the District of Parkers-
burg, by the County Court to the defendant Hambleton &
Company, on the ground of fraud and inadequacy of con-
sideration, and further because the County Court did not
have authority to sell the stock. Plaintiffs appeal from a de-
cree of the circuit court dismissing the cause, and holding that
no fraud or collusion was practiced by any one or more of
the parties interested in the purchase of said stock; and that
it was sold for a fair and adequate price.

The Parkersburg-Ohio Bridge Company was chartered July
29, 1913, for the purpose of constructing and operating a
bridge across the Ohio River between the city of Parkersburg,
West Virginia, and the village of Belpre, in the State of
Ohio. Being unable to interest private capital in the ven-
ture, the bridge company petitioned the County Court of
Wood County to purchase $175,000.00 of its capital stock for
the District of Parkersburg. Thereupon the County Court
entered an order, May 6, 1914, calling an election in the dis-
trict to vote bonds for the purchase of said stock, and pro-
viding:

> "So far as consistent with law the said stock
> shall be held for the use and benefit of the Dis-
> trict of Parkersburg, and all dividends thereon
> shall be first applied towards paying the interest
> on the $175,000.00 of district bonds to be voted by
> said district as consideration therefor, and all
> avails of said stock, either from dividends thereon,
> or from sales thereof, after the payment of in-

terest on said district bonds, shall be used by said County Court for the retirement of said district bonds and any surplus resulting therefrom shall be held and used for the benefit of the District of Parkersburg.''

The bonds were authorized and the County Court entered an order, January 23, 1915, subscribing for $175,000.00 of said bridge stock on behalf of said district, directing the exchange therefor of bonds in like amount, and stating:

"The dividends on the capital stock of said Bridge Company, if any, when such dividends shall be collected and paid into the treasury, shall be applied annually in diminution of the district levy. The principal of the capital stock of said Bridge Company given in exchange for said district bonds, when and as said stock shall be purchased or retired by said Bridge Company, or in any manner disposed of by this Court, shall be applied by this court to the payment of the principal of said bonds at maturity, or when called in the exercise of the right of redemption, as aforesaid, or the same may be paid into the sinking fund for the payment of the principal of said bonds, and applied in diminution of the district levy.''

The Bridge Company sold the District bonds, $250,000.00 of its own bonds, and $52,300.00 of its capital stock, in addition to the $175,000.00 in stock issued to the County Court for the benefit of the District, to construct the bridge, which was completed in April, 1916, at a cost of about $495,000.00, including discount on the bonds. In order to protect its business, the Company also purchased the franchise of a nearby ferry for $24,000.00. The bridge has been in continuous operation since its completion.

May 2, 1916, the defendant M. R. Lowther was appointed by the County Court as its agent to vote the bridge stock belonging to the District. July 2, 1916, Lowther was also appointed by the County Court trustee of the sinking fund for the retirement of the bonds. In the same year he also became treasurer and general manager of the Bridge Com-

pany, and has continued since to hold, and exercise the duties of, all three positions.

Prior to February 13, 1926, only two (4½ per cent) dividends had been declared, and the stock was selling considerably below par. On that date the County Court sold and transferred to the defendant Hambleton & Company (purchasing for itself and others) at par the 1,750 shares of stock owned by the District, receiving as evidence of the consideration a certified check for $175,000.00 drawn by Hambleton & Company on the Baltimore Trust Company, of Baltimore, Maryland.

It is charged that the County Court did not have authority to sell the stock and that the sale was effected through a fraudulent scheme between the members of the County Court and the purchasers, at a grossly inadequate price.

The first question for determination is the right of the County Court to sell the stock. Section 24, Chapter 39, Code, provides:

> "When the county court of any county deems it desirable for the county, or any district thereof, to appropriate money to aid in the construction of a railroad, or any other work of internal improvement, through, by, or near such county, district or districts, they may, by an order specifying the work to which the money is proposed to be appropriated, and the amount of the proposed appropriation, cause a vote to be taken upon the question at the several places of voting in the county, district, or districts. * * * If it appear by said poll that not less than three-fifths of the voters of the county, district, or districts, who voted upon the question of the proposed appropriation, are in favor of the same, the county court will then have authority to cause subscription to be made in the name of the county, district or districts, to the stock or bonds of any company which will undertake the work, to the amount proposed, or any less amount, on such terms as they may deem advisable, and to provide for the payment thereof by county or district taxation or loans. The right to the stock or bonds subscribed for in pursuance to this section, shall be vested in the said county,

district or districts, and the county court thereof shall have authority from time to time, to appoint a proxy to represent the said stock in meetings and elections to be held by the stockholders of the company. The dividend of such stock or interest on such bonds, shall be collected as the court may order, and be paid into the county treasury; or be paid and credited to the free school fund of the district or districts, where the subscription to stock or bonds is made by a district or districts."

Section 156, Chapter 43, Code, also provides:

"When any joint stock company has been heretofore incorporated by this State to construct a * * * bridge wholly or in part in any county, the county court of such county may subscribe for, take, hold and dispose of stock in such company under the regulations, and subject to the restrictions prescribed by law."

These two sections, read together, in our opinion authorize the County Court, as the legal representative of the District, to purchase, hold, and dispose of stock in an incorporated company constructing internal improvements in the District.

The apparent secrecy of the transaction is the chief circumstance relied upon to establish the alleged fraud. The defendants admit that the purchase was made by Hambleton & Company on behalf of itself and the defendants J. Mentor Caldwell, Henry H. Dils, and Edwin A. Brast. This is shown by a written contract, executed by these parties prior to the sale, designated "Syndicate Agreement", and exhibited with the plea in abatement of the defendant Edwin A. Brast, providing that twenty per cent of the stock was to have been purchased for Hambleton & Company, twenty per cent for Caldwell, twenty per cent for Dils, and forty per cent for Brast. The plaintiffs contend that the defendants John Marshall and Edwin A. Brast were equally interested in the forty per cent of stock to have been purchased for the latter under the syndicate agreement.

It appears that J. Mentor Caldwell, of Fort Worth, Texas, while visiting in Parkersburg, his former home, during the holidays of 1925, conceived the idea of purchasing the capital

stock of the bridge company.   He presented the scheme to
Brast and his brother-in-law, Dils.   These three, through
Marshall, who was president of the Bridge Company, in-
terested Hambleton & Company (a financial corporation of
Baltimore, Maryland) in the project and it secured a loan of
$250,000.00 from the Baltimore Trust Company to buy the
stock for the benefit of itself, Dils, Caldwell and Brast.   Ac-
cording to his testimony, Brast and Caldwell consulted Low-
ther on numerous occasions, between January 1st and Febru-
ary 13th, 1926, concerning the proposed purchase, advising
him of their purpose to offer par for the District stock.   Low-
ther says further that he discussed the matter with J. H.
Anderson, president of the County Court, a week or two prior
to the sale, and that Anderson then knew from other sources
that an offer for the stock would be made by Caldwell and his
associates.   Dils states he was informed by Caldwell, prior to
the sale, that the County Court would sell the stock.   Henry
H. Jenkins, an officer of Hambleton & Company, who ap-
peared before the County Court and made the purchase in
the name of Hambleton & Company, on behalf of it, Caldwell,
Dils and Brast, also testifies that Brast advised the parties
interested in the purchase, before the sale, he thought the
District stock could be purchased at par.

The syndicate agreement authorized and directed the Balti-
more Trust Company, as manager, to proceed with negotia-
tions for the purchase of not less than $175,000.00 par value
of the stock, and upon the acquisition of this amount to pur-
chase the remaining stock at an average cost of not more
than $143.00 per share.   In explanation of this provision,
Henry H. Jenkins, in his testimony states:

> "When the matter came up, Mr. Brast stated
> that he thought the County Court stock could be
> purchased at par and we asked him what the
> minority stock could be bought for.   He told us
> that in his opinion it could also be bought in the
> neighborhood of par, because transactions had been
> made in the stock at around, I think, 60 or 70, I
> just don't recollect the exact figure.   The total
> amount of stock outstanding was 2270 shares, I
> think, which would be a total cost of $227,000.00,

> but we thought that it would be advisable to form
> the syndicate for $250,000.00 to give us some
> leeway in the purchase of the minority stock,
> therefore, if you deduct $175,000 from $250,000
> and divided the result by the amount of minority
> shares outstanding, you will work out to just about
> $143.00 a share. That is how the figure was
> arrived at.''

Jenkins arrived at Parkersburg from Baltimore in the early morning of February 13th, going to the office of Brast at the Chancellor Hotel, where he met Brast, Dils, Caldwell and Robert B. McDougle, an attorney, who had been employed to represent the syndicate. Brast 'phoned C. E. Pahl, clerk of the county court, that a gentleman wanted to see him at the hotel, and requested Pahl to stop at the hotel en route to his office. Pahl at once complied with the request, going to the hotel where he was introduced to Jenkins, who presented Pahl with a written order already prepared by the prospective purchasers, to be entered by the County Court, accepting the offer of $175,000.00 for the transfer of the stock to Hambleton & Company. It seems the order as then drafted provided not only for the sale and transfer of the stock, but for the distribution of the proceeds by the County Court. The clerk was requested by Jenkins, or some one else in the meeting, to take the draft and rewrite it into two orders as directed.

Soon after nine o'clock Brast, Caldwell, Dils and McDougle appeared at the county court room. None of the members of the Court being present, Dils requested Pahl to find Barrett. Going at once to Anderson's store (in the city), where Barrett often stopped in traveling from his home to the courthouse, Pahl met Anderson and Barrett, whom he advised that there were some men waiting at the courthouse to buy the bridge stock. Anderson replied that he would not "consider anything like that until court convenes". Barrett stated that he had to go to the barber shop first, and that "we will settle that after court meets". Anderson and Alleman, the third member of the Court, arrived about ten o'clock, the time for convening the Court, but did not proceed with any business until Barrett came in ten minutes later. Immediately Jenkins was introduced to the Court as one who desired to make an offer for the bridge stock. Thereupon, without fur-

ther preliminaries, Jenkins offered $175,000.00 cash for the stock, evidenced by the certified check.

According to the testimony of Alleman, when the offer was made he told the other members of the Court that the deal was new to him, and he would like a little time to consider it; but: "Mr. Lowther said he thought it was a very good deal, and the thing was talked on there for a little while, and after I had asked time to consider the deal, Mr. Anderson spoke up and said, 'So far as I am concerned, I don't wish any time to consider it'; and he asked Mr. Barrett how he felt about selling the bridge, and Mr. Barrett said he thought it was a very good sale, and I says, If you gentlemen are in favor of selling the bridge I won't oppose you."

The orders, which had been prepared in advance, were immediately entered. The entire transaction probably consumed only about half an hour. It seems the Court, before accepting the bid made only two inquiries, one of M. R. Lowther as to the value of the stock, and the other of Robert B. McDougle, attorney for the prospective purchasers, as to whether the Court had authority to make the sale; and being advised by Lowther that it was a good deal, and by McDougle that the Court was authorized to sell the stock, the offer was accepted. The prospective purchasers not only secured a loan of $250,000.00 in contemplation of purchasing the District stock at par, but examined the books of the Company, employed a firm of engineers to inspect and appraise the bridge to determine its present condition and reproduction value, and secured the signature of Marshall, as president, to twenty-seven blank stock certificates for the purpose of transferring this stock and stock privately owned in event they were able to purchase the same according to the terms of the syndicate agreement. If negotiations had been pending between the purchasers and members of the County Court before the sale, as the evidence tends to show, no knowledge thereof reached the public or other officials of the county. It does not appear that the County Court had ever indicated before that the stock was for sale.

At a meeting of citizens a few days after the sale the transaction was vigorously attacked by a number of speakers; and

this suit followed. The original bill was filed February 26, 1926.

All three members of the County Court signed a statement, published in the Parkersburg Sentinel March 11th, 1926, as follows:

> "1. We resent and emphatically deny the charges of having fraudulently colluded with the purchasers of this bridge stock as charged in the plaintiff's Bill in the suit filed in the Circuit Court of Wood County, West Virginia, and in some of the remarks made by certain persons at the public meeting held to protest against the sale of the bridge.
>
> "2. We emphatically affirm our right to sell the bridge property.
>
> "3. At the time the sale was made we honestly and sincerely believed that the bridge stock was not worth a dollar more than the price for which it was sold, and believed that it was to the best interest of the people of Wood County to accept the offer when made, as we believed it was an unusually good one.
>
> "4. Our belief that the price offered was an unusually good one, and should be accepted and the sale made, was based on our reliance on, and confidence in, the advice of certain persons, who were thoroughly familiar with the bridge property, who assured us that the bridge was not worth more than the price offered, and that such a sale was to the best interest of the people of the County. But since the consummation of the said sale we have made a careful investigation, and as a result of that investigation we are advised and believe that we were deceived as to the value of the bridge stock, and that it is worth a great deal more than it was sold for.
>
> "5. We are unalterably opposed to the bridge stock, so sold, being retained by the purchasers thereof, and we pledge ourselves both jointly and severally to do everything within our power to have the said sale set aside and we have been and are now making exhaustive investigations which we believe will be of material help in having the sale cancelled."

By their sworn answer afterwards filed in the suit the members of the Court now say that they "are unable to state definitely whether or not they were deceived as to the value and actual value of said bridge stock."

The original cost of the bridge, including discount on bonds sold by the company to secure funds for its construction, as already stated, was about $495,000.00. R. P. Davis, professor of structural and hydraulic engineering of West Virginia University, testifying for plaintiffs, estimated its reproduction cost, less depreciation, at $757,324.00. Charles S. Davis, a consulting engineer, another witness for the plaintiffs, fixes the reproduction cost, less depreciation, at $782,206.00. The engineers employed by Hableton & Company reported to it a greater reproduction value.

Numerous business men of Parkersburg, testifying for the plaintiffs, say that the stock in their opinion is worth at least $300.00 per share. D. B. Crawford, a party plaintiff to the original bill, and now the financial backer and mainstay of the suit, testifies that the stock is worth from $300.00 to $350.00 per share. He also offers, by way of an upset bid, to pay $300.00 per share therefor, and to execute bond with good security guaranteeing performance on his part if his bid is accepted.

The operating history of the company follows:

FOR THE YEAR ENDING APRIL 30, 1917:

| | |
|---|---:|
| Total revenues, including tolls collected........$ | 18,614.29 |
| Operating expenses ............................................... | 16,332.07 |
| Interest on bonds paid and accrued, less accrued interest on bonds sold.............................. | 13,751.50 |
| Net profit and surplus........................................... | 2,580.57 |

FOR THE YEAR ENDING APRIL 30, 1918:

| | |
|---|---:|
| Total revenues, including tolls collected..........$ | 26,795.52 |
| Operating expenses, including depreciation charge of $10,000.00......................................... | 16,965.33 |
| Interest on bonds paid and accrued................... | 13,217.50 |
| Depreciation for previous period....................... | 8,798.00 |
| Deficit for the year, after crediting previous year's net profit and surplus.......................... | 9,604.74 |

FOR THE YEAR ENDING APRIL 30, 1919:

> Total revenues, including tolls collected........$ 29,933.38
> Operating expenses, including depreciation
>    charge of $10,000.00........................................ 17,398.59
> Interest on bonds paid and accrued................. 13,218.34
> Deficit for the year, including deficit for the
>    previous year ...................................................... 10,288.29

FOR THE YEAR ENDING APRIL 30, 1920:

> Total revenues, including tolls collected........$ 36,636.02
> Operating expenses, including depreciation
>    charge of $10,000.00........................................ 18,074.22
> Interest on bonds paid and accrued................... 13,325.83
> Deficit for the year, after charging deficit for
>    the previous year................................................. 4,980.32

FOR THE YEAR ENDING APRIL 30, 1921:

> Total revenues, including tolls collected..........$ 43,343.83
> Operating expenses, including depreciation
>    charge of $12,500.00........................................ 30,165.15
> Interest on bonds paid and accrued................... 12,782.50
> Deficit for the year, after charging deficit for
>    the previous year................................................. 4,530.15

FOR THE YEAR ENDING APRIL 30, 1922:

> Total revenues, including tolls collected........$ 46,853.79
> Operating expenses, including depreciation
>    charge of $12,500.00........................................ 32,168.41
> Interest on bonds paid and accrued................... 12,655.17
> Deficit for the year, after charging deficit for
>    previous year ...................................................... 2,500.04

FOR THE YEAR ENDING APRIL 30, 1923:

> Total revenues, including tolls collected........$ 64,350.66
> Operating expenses, including depreciation
>    charge of $12,500.00........................................ 32,453.66
> Interest paid and accrued on bonds................... 12,799.00
> Net profit for the year, after charging deficit
>    for previous year................................................. 16,597.76

FOR THE YEAR ENDING APRIL 30, 1924:

> Total revenues, including tolls collected........$ 59,470.35
> Operating expenses, including depreciation
>    charge of $12,500.00........................................ 35,145.16
> Interest paid and accrued on bonds................... 12,891.67
> Net profit for the year........................................... 11,435.52
> Net profit and surplus to date............................. 24,067.58

FOR THE YEAR ENDING APRIL 30, 1925:

Total revenues, including tolls collected........$ 73,181.50
Operating expenses, including depreciation
    charge of $12,500.00....................................... 35,345.39
Interest paid and accrued on bonds................. 12,500.00
Net profit for the year........................................... 25,336.11
Net profit and surplus, after payment of
    $10,228.44 dividends ....................................... 39,175.30

FOR THE YEAR ENDING APRIL 30, 1926:

Total revenues, including tolls collected........$ 94,773.44
Operating expenses, including depreciation
    charge of $12,500.00......................................... 38,734.88
Interest paid and accrued on bonds................. 12,562.50
Net profit for the year........................................... 43,476.06
Net profit and surplus for the year................... 82,651.36

The liquid assets of the company on April 30, 1926, including the depreciation reserve, amounted to about $215,000.00, and its indebtedness about $260,000.00. The syndicate made fifteen or twenty purchases of stock at and around Parkersburg at par, after acquiring the District stock, but paid Pittsburgh owners for a block of 127 shares $150.00 per share. The witness Charles S. Davis estimates that there has been an average depreciation of nineteen per cent. in the various parts of the bridge. This would, according to his estimate of the reproduction cost of the bridge, amount to $183,697.00, or practically the value of the liquid assets. He says:

> "In fixing the per cent. value, I have followed the same system that was adopted in the Government valuation of railroads, and by that system the condition per cent. represents the ratio of remaining service life to total service life. Items that may have a salvage value will affect this ratio so that at the expiration of the life of the structure instead of having zero per cent. condition or zero value, it will have a value equal to scrap value. The value at any intermediate time between new and total life would be in direct proportion between scrap value at full life and cost new at the start. There are many items of this structure that would have a longer service life than shown in my calculation. For instance, the river piers

would last longer than the structure,—than the super-structure, but it is generally accepted that when a bridge has outlived the life of its super-structure, it has outlived the life of its sub-structure even though it is in good condition.''

M. R. Lowther states that it will be necessary within a short time to renew the floor of the bridge at great cost.

Taking into consideration the financial history of the Company, the market value of the stock prior to and at the time of the sale, the substantial depreciation of the bridge, the uncertainty as to its probable life, and other evidence of value, as well as the finding of the circuit court upon this issue, we cannot say that the value of the stock at the time of the sale was greatly in excess of the price received. But upon consideration of all the evidence in the case, and the bona fide offer of $300.00 per share for the stock by D. B. Crawford, who is financially able to perform on his part, we are of opinion to set aside the sale complained of upon the condition that said Crawford execute his bid of $300.00 per share by paying to the purchasers, or the holders of said stock, $175,000.00 with interest from February 13, 1926, and the balance of the purchase price to the County Court of Wood County to be disbursed or expended as the law directs. There is no other course indicated by the plaintiffs for restoring the *status quo.* They do not tender or offer to repay to the purchasers any of the purchase money. The County Court is not in a position to return the consideration. This money has been applied by it in payment of the bonds voted by the District to buy the stock.

The cause is remanded to the circuit court with directions to accept the offer of said Crawford, providing he shall, within thirty days from the finality of the decree in this Court, execute bond with approved security, conditioned for the execution of his said bid within such time as the circuit court in its discretion may fix. If said Crawford fail to give such bond within the time specified, the decree of the circuit court herein appealed from shall stand affirmed.

*Reversed on condition.*