L. H. Davis, *et al. v.* West Virginia Bridge Commission, *et al.*

(CC. 461)

Submitted September 20, 1932.   Decided November 22, 1932.

*Wm. H. Sawyers* and *Geo. W. Williams* and *Carl C. Sanders,* for plaintiffs.

*Howard B. Lee,* Attorney General and *R. Dennis Steed,* Assistant Attorney General, for defendants.

Maxwell, Judge:

The circuit court of Summers County overruled a demurrer to the plaintiffs' bill, sustained a demurrer to and dismissed defendants' plea in abatement and attempted to certify to us both bill and plea. As the plea was dismissed, we cannot consider its sufficiency on certification; but that inhibition is of no real consequence in this proceeding as the demurrer to the bill presents the same question raised by the plea.

Stripped of redundancy, the bill alleges that plaintiffs are users and patrons of a toll bridge across New River at Hinton; that the bridge was constructed in 1906 at a cost not exceeding $42,000; that it has been in constant use ever since

but has not been kept in proper repair and that the expenditure of $55,000 is requisite now to repair and strengthen it; that it was built for light traffic such as horses, buggies and wagons, and its structure is much too light for modern heavy motor cars; that it was located without reference to the state highway (route No. 3) now leading into Hinton and is not convenient thereto; that a modern and adequate bridge could be constructed at a suitable location at a cost not exceeding $160,000; that New River at Hinton is not a navigable river within the meaning of the statute; yet the defendant, West Virginia Bridge Commission, secretly negotiated the purchase of the bridge from its owner, the defendant, Hinton Toll Bridge Company, in December, 1931, at the price of $325,000, payable in bridge revenue bonds; and that the transaction is fradulent, illegal and void. Cancellation of the purchase is sought.

The allegations of secret purchase at $325,000 of an antiquated and inconvenient bridge costing only $42,000 a quarter of a century ago, and upon which $55,000 must be spent for immediate repairs, when a modern, adequate and convenient structure could be built for $160,000, make a sufficient charge of constructive fraud. We are not unmindful that it appears from the bill the tolls from the bridge have been averaging some $60,000 annually in recent years. But the imposition of excessive tolls by a public utility does not add to the real worth of its property.

The Act establishing the Bridge Commission (in both title and body) confines the authority of the commission in the purchase of bridges to such only as span ''navigable'' rivers. Acts 1929, chapter 8, section 3. The allegation that the New River at Hinton is not navigable involves a direct charge of the unlawfulness of the contract, irrespective of fraud.

In view of the statutory provision that bridge bond issues are to be paid from bridge tolls, the allegation that plaintiffs use the bridge and pay tolls shows sufficient interest to sustain their suit.

All of the members of the court are of opinion that the allegations of the bill present a case for equity determination. Also, that the State Bridge Commission cannot obtain constitutional immunity from suit, on the matters herein involved,

on the ground that it is an arm of the state. The Constitution provides: "The State of West Virginia shall never be made defendant in any court of law or equity." W. Va. Cons., Art. VI, sec. 35. Immunity is peculiarly applicable where financial liability is sought to be fastened on the state through some branch of its government. Such cases present a situation "where the state, though not named, is the real party against which the relief is asked and judgment will operate." *Miller* v. *Bd. of Agriculture*, 46 W. Va. 192, 32 S. E. 1007, 1008. If a mere ministerial duty is to be performed by a state official, board or commission, mandamus will lie to compel action. *Gordon* v. *State Board of Control*, 85 W. Va. 739, 102 S. E. 688. While suits against state boards and commissions for the purpose of establishing liability which would be borne by the state are held to be against the state itself and therefore inhibited by the said constitutional provision—*Miller* v. *Bd. of Agriculture, supra; Supply Co.* v. *Board of Control*, 72 W. Va. 524, 78 S. E. 672; *Mahone* v. *State Road Commission*, 99 W. Va. 397; *Barber* v. *Spencer State Hospital*, 95 W. Va. 463, 121 S. E. 497—such immunity does not apply where the official action in suit is unlawful. *Downs* v. *Lazelle, Judge*, 102 W. Va. 663, 136 S. E. 195. Where there is adequate charge of unlawfulness, there is presented a question for judicial determination.

However, a majority of the court is further of opinion that, under the statute, Code 1931, 14-2-4, jurisdiction of the subject matter of this suit may be entertained only in the circuit court of Kanawha County. The statute reads:

"All suits in which it may be necessary and proper to make any of the following public officers a party defendant as representing the State, to-wit: The governor, attorney general, treasurer or auditor; or in which it may be necessary or proper to make any of the following corporations parties defendants, to-wit: The board of public works or any other public corporation composed of officers of government, of the funds and property of which the State is sole owner; and all suits in which it shall be attempted to enjoin or otherwise suspend or affect any judgment or decree on behalf of the State, obtained in the circuit court of the county in which the seat of

> government is, or elsewhere, or any execution issued on such judgment or decree, shall be brought and prosecuted in the circuit court in which the seat of government is.''

In our view, inasmuch as the facts determinative of jurisdiction appear on the face of the bill, the trial chancellor should have sustained the demurrer to the bill and have dismissed the same without prejudice to the plaintiffs' right to prosecute suit in the circuit court of Kanawha County.

We are impressed that the obvious meaning of that statute is that suits against state officials, boards and commissions, with respect to state funds and property and involving official action, shall be prosecuted only in the circuit court of Kanawha County. The manifest purpose of the statute is to prevent the great inconvenience and possible public detriment that would attend if functionaries of the state government should be required to defend official conduct and state's property interests in sections of the commonwealth remote from the capital.

The essence of the statute is that a suit against certain named officials, the board of public works, ''or any other public corporation composed of officers of government, of the funds and property of which the State is sole owner'' shall be prosecuted only in the circuit court of the county of the seat of government.

That bridges bought or erected by the bridge commission are property of the state seems obvious. Though there may be a trust imposed, there is sole ownership by the state for all practical intents and purposes. (This, without reference to the particular bridge in suit.) No refinement of reasoning can submerge the fact that such bridges are acquired by the state to become important parts of its highway system. If the actual ownership does not thus come to be in the state, where is it? The fact that a toll bridge purchased by the commission had been operated as a private enterprise, in our judgment tends to accentuate the thought that after acquisition by the commission there is presented a different situation, namely the operation of a publicly owned bridge for public benefit.

But it is suggested that the act fixing jurisdiction in Kanawha County does not apply to the bridge commission because the state is not the ''sole owner'' of the funds under

the jurisdiction of the commission. This construction is too narrow and results in defeating the broad purpose of the act. It seems to embody a total disregard of the spirit and purpose of the act, and to ignore the letter, too.

The funds of the bridge commission are derived from bridge tolls. Of course the larger portion of such tolls is applied by the commission to discharge bonds issued by it. True, such bonds are not underwritten by the state (*Bates* v. *State Bridge Com.*, 109 W. Va. 186, 153 S. E. 305), but that fact is not important here. For the collection and application of such portion of its revenue as is applied to the discharge of bonds, the commission functions as a sort of trustee, and, let it be conceded that such portion of its funds is not the sole property of the state. But all funds coming to the commission are not thus applied. A substantial portion is applicable to the defrayment of the expenses of the commission (Acts 1929, chapter 8, section 2) and to the repair, maintenance and operation of bridges (Acts 1929, chapter 8, section 10). As to this portion of the commission's revenue, there would seem to be no doubt of the state's sole ownership. We are of opinion that this fact, together with what we conceive to be the fact of the state's sole ownership of bridges erected or purchased by the commission, brings the commission within the meaning and spirit of the law limiting jurisdiction to the county in which the state capitol is located.

Excepting funds passing through the custody of the commission for the benefit of bondholders, we are of opinion that the state stands as the sole owner of all funds and property in the custody of the commission, just the same as of the funds and property in the custody of, for example, the state board of control. Therefore, the very letter of the law seems to be fulfilled. We are impressed that the status of the commission should be thus appraised, that is, with reference to the funds and property in the custody of the commission, belonging to the state, and not appraised solely with reference to funds passing under the control of the commission as a sort of transmitter or temporary depository. Wherefore, it would seem to be unsound to say in effect that the statute fixing jurisdiction in Kanawha County is inapplicable because certain funds pass

through the trusteeship of the commission for the benefit of bondholders.

Neither are we of opinion that allegations of fraud are determinative of jurisdiction. Maybe those allegations are not true. We are impressed that the commission is entitled to have those charges judicially settled in the forum fixed by the statute for the hearing of controversies involving state officials, boards and commissions. If mere allegations of fraud are sufficient to avoid the statute, then the governor or the board of public works may be sued in any county of the state if charges of fraud be involved.

Therefore, entering here such decree as in our opinion the circuit court of Summers County should have entered, we sustain the demurrer to the bill and dismiss the same, without prejudice to the plaintiffs' rights to prosecute in the circuit court of Kanawha County such proper suit as they may be advised.

*Reversed and dismissed.*

HATCHER, PRESIDENT, dissenting:

A dissent is usually futile—a mere gesture of protest. I make that gesture in this case against courts substituting for the plain expression of a statute their impressions of what the statute is or perhaps ought to be. Our difference in this suit relates to the clause in Code 1931, 14-2-4, "or any other public corporation composed of officers of government, of the funds and property of which the State is sole owner." The majority decision, saying it gives the statute a broad construction, in effect excludes that clause. Judge Woods and myself would give heed to the clause and the majority says our construction is too narrow. I submit that the subject is at least debatable.

The history of the clause is illuminating. It first appeared in 1846. On February 18th of that year the House of Delegates assembled at Richmond, Virginia, appointed a committee of seven "to prepare and bring in a bill prescribing certain courts in which suits against public corporations composed of officers of the government may be maintained." The com-

mittee was composed of Messrs. Southall, Baldwin, Chinn, Gresham, Carson, Leake and Gordon (to one familiar with Virginia history, these names demonstrate the distinction of the committee). The bill which they prepared was passed without amendment, on March 5th, and the material part follows:

"Whereas doubts have arisen whether suits in law or in equity, in which the commonwealth may be a party interested through any of her public corporations, composed of officers of the government, may be maintained in any of the courts of this commonwealth, other than the courts holden in the City of Richmond, and as it is proper to remove such doubts:

"1. Be it therefore enacted, That hereafter all actions or suits at law or in equity, in which it may be necessary to make the president and directors of the Literary fund, the president and directors of the Board of Public works, the president and directors of the Northwestern turnpike road, the president and directors of the Southwestern turnpike road, *or any other public corporation, of the funds and property of which, the commonwealth is the sole owner*, and which may be composed of the officers of government, parties defendant, may be instituted in the circuit court of law and chancery for the county of Henrico and City of Richmond, or in the superior court of chancery for the Richmond district, as the case may be, and not in any other court in this commonwealth; * * *" (Italics mine).

In 1809, an act had been passed providing that the governor, attorney general, treasurer or register of the land office, should not be made parties, in their representative capacity, to litigation in any court except the superior court at Richmond. Acts 1803-11, *edi* 1812, ch. 17, sec. 2. This act appears in the Code of 1819, ch. 66, sec. 29. John M. Patton and Conway Robinson, revisors, etc., of the Virginia Code 1846-1849, united the act of 1809 with that of 1846. This union appears in Code 1849, ch. 46, sec. 7, as follows: "All suits, in which it may be necessary or proper to make any of the following public officers a party defendant as representing the commonwealth, to-wit: The governor, attorney-general, treasurer, register of the land office, or either auditor, or in which it may be necessary or proper to make any of the following public corpora-

tions parties defendants, to-wit: the board of the literary fund, board of public works, or any other public corporation composed of officers of government, of the funds and property of which the commonwealth is sole owner * * *, shall be brought and presented in the circuit court for Henrico, of law or chancery as the case may be.''

This statute appears in the Virginia Code of 1860, practically unchanged. It was incorporated without change in description of governmental corporations, in the West Virginia Codes of 1868 and 1870 in chapter 37, section 6. Then, in 1872, *chapter 37 of the Code was repealed.* See Acts 1872-3, chapter 6.

At the regular session of the legislature for 1881 a joint committee was appointed from members of the House and Senate, consisting of James H. Ferguson, Alex. Monroe, Wm. P. Hubbard, R. F. Dennis and E. Boyd Faulkner to revise the code. After ten months consideration, the committee presented to an adjourned session of the legislature in January, 1882, an act reviving and re-enacting chapter 37 of the Code, which was passed February 14, 1882. The members of the House unanimously favored the restoration of the chapter and the Senate favored it by a vote of seventeen to two. The marginal digest of the statute under consideration in the Acts of 1882, page 36, is ''Suits against certain state officials or *certain governmental corporations* to be brought in the circuit court of county wherein seat of government located''. (Italics mine) The statute as then re-enacted is practically the same as Code 1931, 14-2-4, quoted in the majority opinion. The statute was approved without change by the recent Revision and Codification commission, consisting of Melvin G. Sperry, E. H. Morton and Charles W. Lynch (part time) which functioned from 1921 to 1927, inclusive, with Ronald F. Moist, secretary, and a corps of able assistants. It will be noted that the purpose of the initial bill before the Virginia Assembly was to end doubt and to name the courts in which governmental corporations should be sued; and with that in view the seven representative Virginians who prepared the bill wrote into it the qualifying clause as to sole ownership. Those Virginians undoubtedly recognized, as did the subsequent revisors, that in certain governmental corporations the state was the sole owner, while

that condition did not or might not exist in others. Even if we say that the clause was carried into 'the West Virginia Codes of 1868 and 1870 as a matter of course, that cannot be said of it later when such men as James H. Ferguson, Wm. P. Hubbard and E. Boyd Faulkner caused it to be rewritten in our Code in 1882, and such men as Melvin G. Sperry, E. H. Morton and Charles W. Lynch favored its retention in the revision of 1921-7. It is not conceivable that this clause was casual or meaningless to those who coined it in 1846, and to those revisors who scrutinized it in 1849, 1882, and 1921-7 respectively. The conclusion is inescapable that the clause was advisedly prepared and enacted and has been advisedly retained to the present day (except 1872-1882). Therefore, it should not be disregarded or treated lightly, but should be given the significance which its history warrants.

The broad construction of the majority is based on the position that the manifest purpose of the statute is to prevent the inconvenience, etc., to the public functionaries of looking after litigation in sections remote from the capital. That position is gratuitous, as it is not incumbent on a court to conceive a plausible reason for the passage of a statute. If the above position were correct, however, it seems that the lawmakers in 1846 would have said simply that *all governmental corporations should be sued at Richmond* instead of what they did say. The fact that there is no qualifying clause in the statute as to the governor and certain others, and that there is such a clause modifying "other public corporations," is conclusive that the officials and the "other" corporations are not placed in the same class. Moreover, the officials would be inconvenienced in attending a suit in a remote county just as much when the commonwealth is part owner of the funds and property in dispute as when the commonwealth is sole owner. And while litigation in a remote county would inconvenience the officials, litigation at the seat of government would not only inconvenience citizens of a remote county but might be so expensive as to prohibit them altogether from pressing their claims. If we are to surmise that the assembly of Virginia and afterwards the legislature of West Virginia pondered the question of convenience, it is fair to assume that the convenience of citizens remote from the seat of government was

given consideration as well as the convenience of the officials. It may be that in preparing the statute the committee had in mind the homely saying: "It is a poor rule that will not work both ways," and conceived it expedient that the citizen should come to the seat of the state government when the subject in controversy was owned solely by the state, and that the officers of governmental corporations should go to the county of the interested citizen when the state was not sole owner. But if the Virginians who prepared and passed the Act of 1846 were moved at all by consideration of the state functionaries, they did not say so. The purpose they did express, as contained in the preamble of the enactment, was *to remove doubts that had arisen as to the proper courts for litigation of matters in which the commonwealth was interested.*

In the realm of conjecture no one can say another nay; so I would recall my brethren from that realm. It may be that a broader and better reason could be given than the one stated in the preamble. But we must not forget the observation of Omar:

> "The Moving Finger writes; and having writ,
> Moves on: nor all your Piety nor Wit,
> Shall lure it back to cancel half a Line, * * *"

Despite any present dissatisfaction with the purpose expressed in the preamble, it cannot be rewritten, but must stand as the Moving Finger wrote in 1846.

No explanation is needed of the words "of the funds and property of which the state is sole owner". There is no contention even that the clause is ambiguous. It is familiar law that courts should look first to the words of a statute for the legislative intent, and when the language is clear and unequivocal and the accepted meaning of the words employed does not lead to absurdity or injustice, the intent as disclosed by the language should be followed without further inquiry. In such case "the court cannot indulge in speculation as to probable or possible qualifications which might have been in the mind of the legislature." 59 C. J., subject Statutes, sec. 569. Accord: Lewis' Sutherland, Statutory Construction (2d Ed.), secs. 366-7. The reason for the rule is patent. Words are selected (except by a Talleyrand) to express intention and

obviate conjecture. This court is committed to the rule. "Where the words of a statute are plain, free of ambiguity, conveying a plain intent, there is no room for construction by a court, but only for obedience to the legislative will." *Kelley & Moyers* v. *Bowman,* 68 W. Va. 49, 69 S. E. 456. *White* v. *White,* 106 W. Va. 569, 571, 146 S. E. 376. Since the clause is plain there should be only one question to determine—is the state the sole owner of the funds and property of the commission?

THE FUNDS. The funds of the commission are limited by statute to two sources only—(1) the sale of bridge revenue bonds, and (2) tolls from bridges. Section 7 of chapter 8, Acts 1929, expressly provides: "The proceeds of such bonds shall be used solely for the payment of the costs of the bridges and shall be checked out by the chairman of the commission and the secretary-treasurer thereof." Section 10 is equally specific: "Tolls shall be fixed, charged and collected * * * to provide a fund sufficient to pay the principal and interest of such issue of bonds * * *, and placed in a special fund which is hereby pledged to and charged with the payment of the principal of such bonds and the interest thereon," etc. The legislature placed none of the state's revenue at the disposal of the commission and denied it even the right to contract a state debt (Section 12). The commission buys bridges with funds advanced by private citizens and not by the state; the funds it derives from the tolls of bridges above the costs of operation, are expressly impressed with a trust by the statute and the state makes no claim to the funds; so there is no basis in fact whatever for regarding the state as the *sole owner* of such funds.

THE PROPERTY. The real status of a bridge is affected little upon purchase by the commission. The bridge was built for the express purpose of becoming a part of the public highway system; and both in use and purpose the bridge was as much a part of that system before purchase as afterward. I cannot consider a conveyance to the commission as being a conveyance to the state, because the state pays nothing for the bridge, refuses to be responsible for its purchase, and is not a party to the transaction in any sense. The state cannot acquire property in that manner any more than can an indi-

vidual; and, under such circumstances, a court of equity cannot regard the state as becoming the immediate owner of the bridge, much less its sole owner. I cannot follow a comparison of the commission with the board of control because the two bodies are so fundamentally different. The board is a regular agency, using funds admittedly supplied by the state, and having express authority to bind it. The commission is an anomalous agency receiving no funds from the state and having no authority to bind it. The bondholders and not the state, underwrite the commission; and in furnishing the purchase money for a bridge, the bondholders and not the state become the virtual purchasers. Even if it could be held lawful for an impecunious agency such as the commission, to speculate in a bridge for the state's benefit but without its risk, and for the commission to take the title thereto, nevertheless, in equity (where we are now) the commission must be regarded as a mere trustee holding the legal title in trust, first, for the benefit of the original owners of the bridge until the bonds are sold, second, for the bondholders until the indebtedness is fully paid, and, third, for the state. Suppose for some reason—say a more attractive route—the tolls collected will not pay the bonds issued to buy a particular bridge; since the state repudiates liability for the bonds, equity would without doubt subject the bridge itself to the demands of the bondholders. Consequently *sole ownership of such bridges by the state* cannot be predicated on accepted law relating to the acquirement of title. This conclusion does not conflict with the holding that the equitable title of a buyer to property purchased under a conditional sales contract, satisfied the provision of an insurance policy requiring "sole and unconditional ownership". The reasons given for that holding are that the buyer had *the sole beneficial estate* in the property and would sustain *the whole loss* if it were destroyed. *Cook* v. *Ins. Co.,* 105 W. Va. 375, 378, 143 S. E. 113. Here, until the bridge is fully paid for, the state does not own the sole beneficial interest in the property and would not be the sole loser if it were destroyed.

The words of the statute are exact in describing the governmental corporations which can be sued only in Kanawha County. *Sole ownership* by the state of the corporations' funds and property is the one prerequisite. To my mind, the

funds and the property of the commission are not owned solely by the state, and the commission is not within the statutory description.

No reason is apparent for refusing to consider the allegations of fraud on the question of jurisdiction. The majority says, "Maybe those allegations are not true." There is nothing in the allegations inherently improbable or from which it can be inferred that the facts were falsely stated for the purpose of conferring jurisdiction. Therefore, on demurrer, those allegations *must be accepted as true.* If so, they would deprive the commission of consideration as a governmental agency. It is settled law that an agency of the state loses its representative capacity when it commits an unlawful act. A governmental corporation is a representative of the state only within "the spirit of the agency * * * but outside of that, a lawless usurper." *Ry. Co.* v. *Conley,* 67 W. Va. 129, 142, 67 S. E. 613, 619; *Downs* v. *Lazelle,* 102 W. Va. 663, 136 S. E. 195; *Poindexter* v. *Greenhow,* 114 U. S. 270, 290; *Pennoyer* v. *McConnaughy,* 140 U. S. 1, 10, etc. Under the allegations, the title of the commission to the bridge is void, and the state in its impeccable integrity is not interested in having this ill-advised contract maintained.

Consequently, I would hold that the commission does not belong to that select class of governmental corporations whose only forum is Kanawha County, and would affirm the ruling of the circuit court.

Judge Woods authorizes me to say that he concurs in this dissent.