T. E. Miller *et al. v.* Huntington & Ohio Bridge Co. *et al.*

(No. 9161)

Submitted April 8, 1941. Decided May 20, 1941.

*Scott & Ducker* and *Paxton & Seasongood,* for appellant Huntington & Ohio Bridge Co.

*Geo. I. Neal,* for County Court of Cabell County and others.

*Fitzpatrick, Brown & Davis,* for First Huntington National Bank.

*Samuel Biern,* for Stanley M. Cooper.

*F. M. Livezey,* for appellees.

Fox, JUDGE:

The Huntington and Ohio Bridge Company, the County Court of Cabell County, The First Huntington National Bank, and Stanley M. Cooper complain of a decree of the Circuit Court of Cabell County, entered on the 7th day of October, 1940, by which a sale of the bridge owned by the Huntington and Ohio Bridge Company, crossing the Ohio River from Huntington, Cabell County, West Virginia, to Chesapeake, in Lawrence County, Ohio, to the County Court of Cabell County was held to be constructively fraudulent, null and void, and the same set aside and held for naught. A proper consideration of the questions raised on the appeal from said decree, heretofore awarded, calls for an extended presentation of the facts and circumstances leading to the sale so voided by the decree of the trial court. A written opinion filed by the trial judge, and made a part of the record, absolves all parties involved in the sale and purchase from any actual fraud, and while other grounds for setting aside the sale in question are considered in the opinion below, and will be considered here, the final decree appealed from sets aside the said sale solely on the ground of constructive fraud.

In the year 1924 certain business and professional men, residents of the City of Huntington, conceived the idea of erecting a highway bridge from Huntington, West Virginia, across the Ohio River, to a northern terminus in Lawrence County, Ohio, and on July 24, 1924, secured from the State of West Virginia a charter of incorporation for the Huntington and Ohio Bridge Company, and on January 12, 1925, procured from the City of Huntington a franchise covering the proposed bridge, which fran-

chise was amended on March 23, 1925. It being known that the bridge, when erected, would constitute a link in an interstate highway, the consent of Congress to erect the same was sought, and obtained through an Act of that · body approved on January 26, 1925. Under the authority of these grants by public authorities, the bridge was completed during the year 1926.

The record shows that the cost of the bridge, including a new floor, was approximately $985,000.00. The replacement cost of the structure in September, 1940, is practically agreed upon, one of the two witnesses who testified on that point fixing it at $1,135,000.00, the other at $1,143,400.00. It was financed in the beginning by the issuance and sale at par of 9,250 shares of seven per cent preferred stock of a par value of $100.00 per share, and 12,000 shares of common stock of the par value of $1.00 per share. Presumably the cost of additions and improvements to the floor was paid out of earnings, but now seems to be considered as capital investment.

In neither of the estimates of replacement cost is the value of franchise, going concern value, or earnings taken into consideration. In another estimate of present value the witness Steinman figures the original cost of the bridge in 1926 at $985,000.00, and adds $150,000.00 by reason of increased cost of construction, and fixes present replacement costs at $1,135,000.00. From this he deducts $375,000.00 representing an annual two and one-half per cent depreciation for fourteen years, leaving $760,000.00 as the present replacement cost less depreciation. For some reason not clear to us, $75,000.00 is deducted from this last figure because the witness thought a suspension bridge could have been erected, or could be erected for ten per cent less than the type which was built, and the value of which we are now asked to consider. The witness then adds to the replacement value, less depreciation, the sum of $200,000.00 for "going value," making a total of $885,000.00, still leaving out of consideration the value of the franchises, and the earning record, and prospective earnings, which, as we understand, are not ordinarily classified as an element of going concern value. Another

witness, Allen, estimates the present replacement cost of the bridge at $1,143,000.00, and also estimates the useful life of the structure at fifty years, which would indicate a two per cent depreciation each year, and as calculated by counsel for appellees would make the present replacement value, less depreciation, the sum of $822,848.00, with no account being taken of earnings, past and prospective, franchise and going concern value.

No witness estimates the value of the franchise or grants by public authorities under which the bridge was constructed and is now being operated. Some stress is placed on the fact that the Act of Congress granting permission to erect the bridge does not contain any clause under which the privilege granted could be withdrawn during the running of the fifty-year period, and it is agreed that this gives an added value to the congressional grant; on the other hand the appellees say that control of the tolls and rates is vested in the War Department, and that the Act of July 2, 1926, is expressly made subject to the Act of March 23, 1906, which requires such rates of tolls to be reasonable, and is, by express provision subject to repeal or amendment.

The earnings of the bridge have a marked bearing on the question at issue. These earnings have been very satisfactory from the beginning. During the four years preceding the sale and purchase under attack, the gross receipts from the bridge averaged $212,699.25; and for the last three years of this term the average net earnings, before deducting income tax, was $159,935.68, and $133,-697.74 after deducting the tax. The record shows that fears are entertained that these earnings may not be maintained in years to come by reason of the anticipated freeing from toll of what is known as the Ashland bridge over the Ohio River near Ashland, Kentucky, and the bridge over the Big Sandy River between Catlettsburg and Kenova, which would provide free traffic from Ohio to Huntington. Just when these bridges will become free is not clearly shown, nor can it be, but appears near enough to justify the belief that it should be taken into consideration in estimating the future earnings of the

Huntington bridge. Witness Warfield estimates that the average yearly gross earnings of the bridge for the years 1943 to 1947, both inclusive, will be $151,200.00 or $61,499.25 under the average for the five years next preceding the sale. Then it is contended that the tolls charged on the Huntington bridge are unreasonable, and that a proper reduction of tolls would further reduce revenues. This claim is denied, and the contention is made that the freeing of the Ashland and Big Sandy bridges from tolls will not operate against the Huntington bridge to the extent estimated, by reason of other charges which traffic over the free bridges would have to bear in the way of taxes in Kentucky, and increased distances.

The sale of the Huntington bridge, with the ultimate view of freeing the same from tolls, has been under discussion for some years, but nothing tangible seems to have developed until 1939, when N. G. Somerville, an accountant who had audited the books of the bridge company, and who is now connected with a banking institution in Huntington, made an offer of $1,750,000.00 in "income producing bonds," less a commission of five per cent. This offer was rejected. In April, 1940, the same party made an offer of $2,000,000.00 cash, subject to a like commission, and this offer was also rejected. At some time in 1940, the State Road Commissioner, acting for the state, made an offer of approximately $1,400,000.00 for the bridge, which was declined, and it appears that about the time of the transaction with Cooper hereafter discussed, the state, through its Road Commissioner, was prepared to increase its offer, the amount of such proposed increase being unknown. It seems quite clear that the owners of the bridge were not disposed to part with their property for the best offer then made, which would have been $1,900,000.00 after deducting commissions.

This was the situation when news of an Act of Congress, approved July 2, 1940, first became known. A new situation was created thereby. Under it, Lawrence County, Ohio, or its Bridge Commission, was authorized to acquire the Huntington bridge by condemnation, and in the manner herein set out. The fact that the act in

question provided for, if it did not require, the grouping together and financing of other bridges within Lawrence County created the belief that the purpose of the Act was to authorize Lawrence County, or its Bridge Commission, to acquire the Huntington bridge and a bridge across the Ohio River at Ironton in said county. The Ironton bridge was in a bad state of repair, the cost of rehabilitation being estimated at $195,000.00. It had not been financially successful, and, as appellants contend, could only prove a burden on any other bridge with which it might be grouped, in the sense that revenues from other bridges would be necessary to its maintenance and operation.

Under these conditions the owners of the Huntington bridge apparently decided to sell. On July 30, 1940, the authorized officials of the bridge company made an agreement with Stanley M. Cooper to sell the bridge at the price of $1,815,922.50, a sum arrived at by figuring all outstanding preferred stock at par, and placing a value of $100.00 upon each share of common stock authorized by its charter. In this agreement the bridge company was given until August 20, 1940, the date when the transaction was to be consummated, in which period it might, if it elected to do so, collect and deliver the outstanding stock, rather than make a conveyance of the property. It was contemplated that this transfer of stock would not entail a federal tax, and would thus effect a saving of approximately $360,000.00. It was also provided that the parties would be released from the contract should proceedings to condemn the bridge be instituted prior to tender of compliance therewith by Cooper. Under the agreement the bridge was to be ultimately transferred to the State of West Virginia, or some political subdivision thereof, this upon the payment in full of any bonds issued for the account of said bridge.

Apparently the bridge owners were fearful that proceedings to condemn their property might at any time be instituted by the Ohio authorities, which would release Cooper from his agreement to buy. The act of Congress under which the Ohio authorities could act empowered them to acquire "any privately owned highway toll bridge

across the Ohio river at any point within or adjoining said county", so that, the appellants seemed to think, if they could transfer the bridge to some public authority of this state, the Ohio authorities would be frustrated in their supposed purpose to take over the bridge. The situation having thus developed, the idea of selling the bridge to the County Court of Cabell County was suggested by some one within the bridge company organization. Of course, having contracted to sell the bridge to Cooper, nothing could be done without his consent, and this consent seems to have been obtained by an agreement to sell to him the bonds, which the bridge company expected to get from the county court should a sale be made to it. The proposal which the bridge company contemplated making to the county court was to sell to it the bridge for $2,000,000.00 in revenue bonds, $500,000.00 of serial bonds payable over a period of ten years, and to bear interest at the rate of 2¾ per cent per annum, and the residue of $1,500,000.00 payable in twenty-five years, bearing 3¼ per cent interest, subject to call upon the payment of stipulated varying premiums. The agreement with Cooper was that he should be permitted to purchase these bonds, if issued, at the price of $1,815,922.50, the exact figure at which he had agreed to purchase the bridge, or the stock of the bridge corporation.

Having conceived the idea of selling the bridge to the county court, the bridge owners lost no time in preparing the offer of sale which they proposed to make. They acted in haste and secretly. A joint meeting of the directors and stockholders, sufficient in number of directors and in stockholdings to make the meeting legal for all purposes, was held at the home of the president of the bridge company on the night of August 2, 1940, and there the terms of the proposed offer to the county court were worked out and put in written form; all papers necessary to an acceptance thereof were prepared by attorneys for the bridge company; and a deed prepared by them conveying the bridge property to the county court, so that, in the event of the acceptance of the offer by the court there would be no delay in the transfer of the title to the

bridge. Up to this time the county court had not been consulted, and the evidence is undisputed that its first knowledge of the proposal was when it was presented on the morning following the meeting at the president's home.

On August 3, 1940, about 9:30 in the forenoon, certain officials of the bridge company, accompanied by counsel and accountants, appeared before the county court and laid before it the proposition to sell the bridge on the terms set out above. The county court met in the office of its president, which fact is explained by evidence that repairs then being made on the court house made the regular meeting place unfit for use at that time. We attach no importance to the place of meeting. The proposition of the bridge company was fully outlined, and some two or three hours consumed in its discussion. The earnings of the bridge were discussed, and apparently every question which might reasonably affect the value of the bridge seems to have been considered. The importance of retaining control of the bridge by friendly interests was stressed, and the supposed danger of the bridge passing into the hands of the Ohio authorities was emphasized. It seems clear that the dealings between the bridge company and Cooper, although possibly not in complete detail, were disclosed, and, so far as we can determine from the record, no information of importance, bearing upon the transaction was withheld by the representatives of the bridge company. The county court did not consult the prosecuting attorney, as it could and should have done, but this is attempted to be explained by the court. The explanation is not entirely satisfactory, but the failure to so consult this official is not in itself sufficient to warrant the setting aside of the sale under attack. After this full discussion the court retired to another room, and returned in about one-half hour. The proposition to sell the bridge was accepted. The proper order, already prepared, was entered, a deed duly executed and delivered by the bridge corporation to the county court, and recorded in Cabell County, all on August

3, and the transaction thus fully consummated on that day.

It is apparent that agreements involving public interests of the magnitude of those being considered are not ordinarily entered into under conditions such as those surrounding the execution of the sale and purchase under attack. Transactions of this character are usually attended with much publicity and consequent discussion. Under ordinary conditions we would say that the execution of an agreement such as that before us, under the circumstances developed by the record, might in itself justify a decree setting it aside; and we now say that the circumstances under which the sale and purchase of August 3, 1940, was made calls for a clear showing of good faith and fair dealing on the part of every individual or corporation participating therein.

While the decree complained of is, in terms, based on what the court held to be constructive fraud, the questions argued are broader, and fall into three main points: (1) Are the plaintiffs below entitled to maintain this suit; (2) has the county court legal authority to purchase and operate the bridge in question; and (3) if the power exists was the exercise thereof in this case tainted with such constructive or other fraud as will warrant us in voiding the sale and purchase under investigation. These questions will be considered in the order stated.

The plaintiffs below instituted this suit as citizens and taxpayers of Cabell County, and as users of the bridge in question, and on behalf of themselves and all others similarly situated. It is contended by the appellants here that their interest in the transaction complained of is not of such a nature as to entitle them to interfere, by suit, with the powers and discretion of the county court. We cannot accept this view.. In *Davis* v. *Bridge Commission,* 113 W. Va. 110, 166 S. E. 819, the right of a citizen and taxpayer to question, by a suit in equity, the purchase of a toll bridge is recognized, and we think the ruling of the court in that case, while not carried into the syllabus, is nevertheless law rather than *dicta,* if there be a distinction between the two. If it be assumed that the county

court had no power to purchase the bridge, then clearly its act in so doing was void and could be attacked by any citizen or taxpayer; and if it be assumed that it had such power, then it must be exercised in a lawful manner and free from fraud. The contract of purchase, by its very terms, contemplates that at some time in the future a burden will be imposed on some public body to maintain and operate the bridge, to say nothing of the interest of citizens and users of the same while the debt against it is being liquidated. We think it a sound position to take that when a statute vests power in any public authority there goes with it an implied right in the public to use the processes of law available to see that the powers so conferred are lawfully used. We therefore find no difficulty in holding that the plaintiffs are entitled to maintain their suit.

The next question concerns the power of the county court to purchase the bridge. The trial court was of the opinion, as expressed in its memorandum, that such power does not exist, and we must, therefore, examine this question carefully; for, if the position of the trial court be correct, we need not consider the question of constructive fraud mentioned in the final decree.

Section 24, Article VIII of our Constitution provides that county courts "shall, under such regulations as may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties, including the establishing and regulation of roadways, bridges, public landings, ferries and mills, with authority to lay and disburse the county levies." What is known as the "Good Roads Amendment", ratified November 2, 1920, provides that "The legislature shall make provision by law for a system of state roads and highways connecting at least the various county seats of the state, and to be under the control and supervision of such state officers and agencies as may be prescribed by law." A comprehensive road statute was enacted at the First Extraordinary Session, 1933, Chapter 40, Code, (Michie 1937) Chapter 17, by which a system of state roads was established to consist of all primary and sec-

ondary roads as defined by the Act. Primary roads were defined by the Act as "All roads under the control and operation of the State Road Commission, or are designated as state roads at the time of the adoption of this act, and roads hereafter designated as primary roads"; and secondary roads were defined as "All roads and bridges now operated as a part of the county-district road system, except bridges and approaches maintained by county courts within municipalities." Section 1 of Article X of the same Act defines the power of the county court in the light of the new statute, and provides: "The county court shall have the superintendence and maintenance of bridges and approaches to bridges situated within municipalities and at the time of the adoption of this act remaining under the control and jurisdiction of the county court."

At the date of the enactment of Chapter 40 of the Acts of 1933, First Extraordinary Session, the acquisition of toll bridges was vested in the State Road Commission, under Chapter 8, Acts of 1929, Code, (1931) 17-17-19 to 28, inclusive, as amended by Section 1, Chapter 1, Acts of Legislature, Extraordinary Session, 1932. At that time, it seems clear that no power was vested in the county court to acquire a bridge even within a municipality. The power of the State Road Commission to purchase a toll bridge was hedged about with certain limitations, such as securing the advice of an engineer, and the approval of the Governor, all of which must still be observed when the Commission acts.

However, the Legislature, at its Second Extraordinary Session, 1933, undertook to legislate further on the subject of toll bridges. By Section 1, Chapter 27 of its Acts, it authorized any city or county court to construct, maintain and operate such bridges over certain streams, including the Ohio River where it borders on this state, and authorized the issuance of revenue bonds to finance the construction, but required compliance with all Federal Laws where a navigable stream was involved, and required the approval of the State Road Commission. Then by Section 2 of said Chapter, the purchase and operation

of an existing toll bridge was authorized in the language following:

> "Any city or county so situated with reference to any river or stream, over and across which there is now a highway bridge, owned and operated by any bridge company or corporation, and situated partly within such city or county, is authorized and empowered to purchase such bridge, with funds obtained in the manner and from the source or sources mentioned by section one of this act, and to own and operate the same, as a self-liquidating enterprise or project; and also to obtain the possession, control and operation of such bridge, under and by a lease or other contract, with the owner or owners thereof, upon such terms and conditions, and for such period of time, as may be agreed upon by such city or county court, and the owner or owners of such bridge."

It must be conceded, we think, that the Legislature had the right to make this enactment. Nothing in the Constitution limits the Legislature in the matter of granting to, or withholding from the county court any power in relation to public highways. The legislative authority to enact the law depriving the county court of its former authority over county-district roads was impliedly upheld in *Appalachian Electric Power Co.* v. *County Court,* 116 W. Va. 306, 180 S. E. 264, and what the Legislature can take away it can restore. The fact that it had vested the State Road Commission with state-wide authority to acquire and operate toll bridges, did not operate to limit its power to confer a like authority on other public agencies, within the territory under which they may function, under the Constitution and relevant statutes. The fact that as the law was immediately before the effective date of the act in question, the power then vested in other agencies to acquire such bridges was subject to certain limitations and requirements not found in Section 2 of Chapter 27, does not affect the power of the Legislature to enact a statute in which such limitations are not present.

Chapter 27 of the Acts of 1933, Second Extraordinary

Session, does not expressly repeal inconsistent acts, and it is contended by the appellees that inasmuch as repeal of any law by implication is not favored, this Act did not repeal any existing law. It is fundamental that repeal by implication is not favored, but that principle does not exclude the necessity of a resort to the rule of implied repeal when necessary to give to the act any effect whatever. If, as the law was at the time Chapter 27 was enacted, the county court had no authority to purchase and operate a toll bridge, then to give to the Act any effect whatever, we must hold that former acts have been superseded to the extent that they prevented the exercise of the power granted by the new statute. To do so is not to hold, strictly speaking, that any existing act has been repealed. Those acts still remain in force in relation to all matters to which they apply. Chapter 27 merely confers certain powers on municipalities and county courts which they did not formerly possess. As the law was, only the State Road Commission could purchase and operate a toll bridge, and the only effect of Chapter 27 is to confer that right, in a limited way, on municipalities and county courts, and this, we think, the Legislature legally and effectively did. Whether this enactment was a wise one, or sufficiently guarded, we do not know; but we do know, that in plain and simple language the Legislature, acting within its constitutional powers, conferred on the county courts the power to purchase and operate existing toll bridges, and to issue revenue bonds to finance the purchase; that it conferred this power without surrounding it with limitations and safeguards against its misuse, applicable to the construction of a new bridge, may have been unwise, but does not, for that reason, affect the validity of the Act. While there is a marked difference in the requirements contained in Sections 1 and 2 of the Act, the reason therefor is plain. The construction of a new bridge, if over a navigable stream would require the consent of the Federal Government, and the requirement of approval by the State Road Commission is based, naturally, on the maintenance by that Commission of control over the highway system of the entire state. The

construction of a new bridge might serve to render use-less, in a comparative sense, bridges and highways already constructed. None of these considerations obtains as to existing bridges. Therefore, we think Section 2 of the Act is entitled to stand alone and, under it, we hold that the County Court of Cabell County had the power to enter into the agreement of August 3, 1940, by which the bridge here involved was purchased.

This brings us to the remaining vital question in this cause: Did fraud enter into the negotiations for, and the execution of the agreement for the sale of the bridge in question, to the extent of invalidating and making void the entire transaction, and was the same such a fraud on the rights of the plaintiffs below and those for whom they sue, as to justify the decree of the trial court?

We are not confronted with any question of actual fraud. Such fraud is not alleged in the bill. There is no proof that it existed, and the trial judge expressly absolves all parties of any actual fraudulent intent or purpose. The decree appealed from is based on a finding of con-structive fraud, and if we are to test the soundness of this finding we must first determine what is meant by con-structive fraud, which, in turn, calls for a definition of actual fraud and the distinction between the two. In *Moore* v. *Gregory*, 146 Va. 504, 131 S. E. 692, Points 5, 6 and 7 of the Syllabus, is found a clear definition of both types of fraud, which we quote in full:

> "Actual fraud is intentional fraud; it consists in deception, intentionally practiced, to induce an-other to part with property or to surrender some legal right, and which accomplishes the end de-signed. Constructive fraud is a breach of legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraud-ulent, because of its tendency to deceive others, to violate public or private confidence, or to in-jure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. An intent to de-ceive is an essential element of actual fraud. The presence or absence of such intent distinguishes actual fraud from constructive fraud."

In *Hulings* v. *Hulings Lumber Co.,* 38 W. Va. 351, 18 S. E. 620, it was said to depend in that case on a fiduciary or confidential relation between the parties, but we do not understand that, strictly speaking, a confidential or fiduciary relation must always exist. The two types of fraud are defined and distinguished in 23 Amer. Jur., 756, where it is said:

"* * * active and positive fraud includes cases of the intentional and successful employment of any cunning, deception, or artifice to circumvent, cheat, or deceive another. Constructive fraud, sometimes called legal fraud, is nevertheless fraud, although it rests upon presumption and rests less upon furtive intent than does moral fraud. It is presumed from the relation of the parties to a transaction or from the circumstances under which it takes place. The conscience is not necessarily affected by it. Indeed, it has been said that it generally involves a mere mistake of fact. Hence, the terms 'constructive fraud' and 'legal fraud' both connote that in certain circumstances, one may be charged with the consequences of his words and acts, as though he has spoken or acted fraudulently, although, properly speaking, his conduct does not merit this opprobrium."

The term is made to include violations of public policy or public rights or transactions affected by illegal conduct of any kind. 1 Story Equity Juris. 349-51; 2 Pomeroy's Equity Juris. 1931, Sections 922-31. Therefore, we think it clear that the transaction here involved is one to which the doctrine of constructive fraud may be properly applied, if a public interest has been prejudiced to a material degree, even though the conduct by which the prejudice may have been developed was not based on any fraudulent intent or purpose, and entirely free therefrom.

So we come to the question of whether there was constructive fraud in the sale and purchase of the bridge in question, and this calls for consideration of two main points: (1) The conduct of the representatives of the

bridge company and the county court in the actual negotiation and execution of the contract of sale; and (2) was the price agreed to be paid for the bridge excessive to the extent that the whole transaction should be set aside. We may properly consider the two propositions together, in their bearing on the final action of the parties involved, but preliminary to such joint consideration they should be discussed separately, and this will be done in the order stated.

It must be admitted that the bridge company was within its rights in endeavoring to dispose of its property at what it considered a fair price, and to escape the threatened action of the Ohio authorities. Nearly fifteen years before it had engaged in a venture with all the risks attendant thereto, and the fact that it proved profitable should not now be held against it. Furthermore, the promoters of the company were, for the most part, citizens of Huntington, and their desire that the enterprise they had launched and developed should be held by some public authority of this state, or one of its subdivisions is understandable, although, of course, local pride should never be used as a cloak for any design to obtain an excessive price for private property. The bridge company had a right to assume that its property had a market value of around $2,000,000.00, for the reason that it had been offered that sum, subject to a five per cent commission, and had refused the same. All the circumstances surrounding this offer, considered in connection with what happened later, indicate that the offer was made in good faith, and, if accepted, would have been made good. It is quite evident that the bridge could have been easily financed for the amount of this offer. This was before the Ohio authorities became active, and when this activity became known the situation changed; instead of being indifferent to a sale, the bridge company was willing to sell for something less than would have been realized from the Somerville offer which had been declined. That was a concession to the new situation. Even then the transfer proposed was from one private owner to another. The threat of action from Ohio was not removed, and the

existence of that threat recognized in the sale to Cooper. Provision was made for a release of the parties to the contract in case condemnation proceedings should be instituted, and a situation had developed where the bridge company could reasonably contend that the value of its property was being depressed by considerations having nothing to do with its real value as a going business, but growing out of threats of appropriation by public authorities of another state, under circumstances not favorable to the ascertainment of the reasonable value of the property involved. It is suggested that possibly this threat was exaggerated; that doubt exists as to whether the Ohio authorities can take by condemnation proceedings instituted in a federal court within its own territory property located in West Virginia; but, without attempting to pass on this question, the threat existed, and the record shows that the claim of the Ohio authorities to take the bridge by condemnation is being asserted in a pending proceeding. So we cannot say that the fears of the bridge company were unwarranted. This being the situation, we feel that the bridge company was justified in seeking a sale of its property to a public authority at a fair price, and in doing so it had the right to carry on a private, or even a secret meeting to work out the terms of any offer it proposed to make. There was no impropriety in the secret meeting held at the home of the president of the company on the night before the offer to the county court was made. Men are entitled to conduct their private business affairs in secret, and usually do so. The fact that at this meeting, and later during the night, papers were prepared by attorneys embodying the offer, providing for its acceptance by the county court, and conveying the bridge property to the court, has no bearing on the decisive question presented, but merely shows that an effort was being made to consummate the sale quickly should the court decide to purchase. No effort is made to conceal the fact that secrecy in the preparation of the offer and haste in its presentation and acceptance were necessary to avoid the risk of action by the Ohio authorities. Clearly, if publicity had been given to the purpose of the

bridge company to make the offer, they could have blocked the proposal by instituting condemnation proceedings, and this was what the bridge company feared and was seeking to avoid. On the whole we see nothing to condemn in the conduct of the bridge company in the secret meeting and preparation of its offer. The offer itself must be tested, not the methods employed in its preparation.

We now come to the presentation of the offer to the county court, and this requires consideration of the acts and conduct of both the court and the bridge company representatives. These representatives appeared before the county court at the court house of the county, during business hours, and openly presented their offer to sell the bridge. The hearing was held in the office of the president of the court, and the failure to have the hearing in the room regularly used for court sessions is explained. The record does not show that any effort was made to conceal the presentation of the offer. It was made in a public place, and persons other than those interested in the offer are shown to have been present on occasions during the morning. The presentation of the offer consumed some two or three hours, and included statements by several individuals, inquiry as to the legal power of the court to make the purchase, investigation of the past earnings of the bridge, and, we think it fair to say, every other question bearing on the proposal which could be said to reasonably arise. At the end of the presentation, and discussion following, the court went into executive session, considered the matter for about thirty minutes and decided to accept the offer. An appropriate order, already prepared as noted above, was then entered, a deed conveying the bridge property to the county court executed and delivered, and promptly recorded on the same day, and the entire transaction thus quickly closed. In making this decision the county court acted without the advice of the prosecuting attorney. The court should have sought the aid of this official, especially as to the legal aspects of the matter, and it appears that he was available; but inasmuch as we have held that the court had the legal power to purchase the bridge, no prejudice

is apparent in the failure of the court to secure the opinion of the prosecuting attorney. Aside from this, we see nothing improper in the way the matter was handled by the court, unless it be the haste with which the transaction was consummated.

When the offer to sell the bridge was made to the county court on the morning of August 3, should the court, under the peculiar circumstances shown to exist, have taken the matter under consideration, given it publicity, invited public discussion and advice, and did its failure to do so amount to such a violation of public duty as to render the action taken by it constructively fraudulent? As indicated in this opinion, if this were an ordinary case, merely involving the advisability of a purchase or the price to be paid, a transaction closed as this one was would call for the closest scrutiny, and the burden of justifying the same would rest more strongly than in the case before us. But this is not an ordinary case. The bridge in question is located almost wholly in Cabell County, and in its largest city, Huntington; it was promoted and built by local efforts and capital, primarily, of course, in the hope of private profit, but, no doubt, with a view to promote the development of Huntington and the surrounding county; Huntington is the magnet which draws all outlying sections, both in Cabell County and across the Ohio River to the use of the bridge, and can we condemn the county court for taking these facts into consideration in determining the question of its purchase? Pride in the ownership of this vital artery of motor traffic, as well as more material considerations involving future control, may well and properly have influenced the court in its action, for, if once the title to the bridge, with the franchises and rights appertaining thereto, pass into the control of the authorities of another state, the future control of the present bridge, and any structure which may replace it, will probably be determined for all time. Again the coupling together of the Huntington bridge with the Ironton bridge, shown by the record to be of doubtful value, and entailing a probable burden through its purchase, repair and operation, which the Huntington bridge might be called upon to carry, should by no means be

overlooked. To our minds the entire plan of the Ohio authorities, involving as it did the purchase and operation of both the Huntington and Ironton bridges, was based on the earning power of the Huntington bridge, and those interested in the future of that bridge, the City of Huntington and Cabell County, might well have felt concern over the maturing of plans calculated to impose this additional burden on the Huntington bridge, assuming that it would in the near future be operated by some public authority and ultimately become a free bridge. In our opinion the county court was justified in taking all these considerations into account in determining whether it should purchase the bridge without delay and the price to be paid therefor.

This brings us to the vital question which must determine our decision: Was the price paid for the bridge, considering the form of payment and interest charges, excessive to the extent of rendering the purchase agreement void on the ground of constructive fraud?

Having held that the county court had legal authority to purchase the bridge, it necessarily follows, as corollary thereto, that it was empowered to exercise a reasonable discretion as to price and terms. Not every unwise or improvident act constitutes constructive fraud. Such an act can be so classified only where there is no reasonable basis therefor, and price alone is not controlling. The attitude of this Court on this subject is well illustrated in *McDonald* v. *County Court,* 94 W. Va. 773, 120 S. E. 891, where an allegedly excessive price was paid for a site for a county jail; and in *Board of Education* v. *County Court,* 104 W. Va. 80, 138 S. E. 761, where stock in a bridge company was attempted to be sold at an allegedly inadequate price. In the case last cited the price at which the stock was sold was $143.00 per share, whereas, a *bona fide* offer of $300.00 per share was made by a responsible person, yet the court refused to set aside the proposed sale at the lesser price on grounds of inadequacy of price, and inferentially held the same not fraudulent, but did, for reasons not stated, set aside the sale on condition that the larger offer be made good. In other words, but for

the offer of $300.00 per share the sale of the stock at $143.00 would, presumably, have been sustained. That was an extreme case of an inadequate price, and is cited to show the reluctance of courts to hold fraudulent transactions involving discretion as to the price at which property is purchased or sold. It goes without saying that the same rule would apply in a case where property is purchased at an allegedly excessive price. We are therefore of the opinion that the County Court of Cabell County was vested with a wide discretion as to the price it would pay for the bridge in question.

Was this discretion abused to the extent that a setting aside of the sale will be justified therefor? Many considerations enter into the answer to that question. Many of them, not involving commercial or actual value, have been considered and repetition is not desirable. Steinman's estimate of present replacement cost is $1,135,000.00 which figure, less depreciation and obsolescence, he reduces to $685,000.00 as the present value. Allen estimates replacement cost at $1,143,000.00, and applying the method of calculating depreciation used by counsel for appellees in his brief, the present value is approximately $822,000.00. Steinman would add $200,000.00 to his estimate of present value for "going value". It is apparent that there is a wide gap between the estimates thus reached and the price at which the bridge was sold. The value of the bridge franchise, contract rights, and the earning power are not considered in either of these estimates. Only "going value" is considered in one of them.

What gives market value to a toll bridge property? Obviously, the number of people who, by reason of its location and surroundings, can be induced to make use of its facilities. The Huntington and Ohio bridge located at some point where tolls would not provide for cost of upkeep and operation, including depreciation and taxes, would be worthless as a going concern, and would have no market or commercial value, other than that which might be realized from the material used in its construction. The Ironton bridge will serve as a good example. Located as it is, the Huntington bridge has made money

for its owners, and while there are some prospects of reduced earnings in the future, these anticipated reductions do not, apparently, create any doubt of the ability of the county court to meet from earnings the obligations it proposes to issue. The rates of toll are shown to be reasonable, when compared with other like enterprises, and while subject to the control of the Secretary of War, a reduction beyond the point where the earnings of the bridge will be jeopardized is not to be anticipated. Reduction of toll rates while the bridge is in the hands of private owners might be serious, but is relatively immaterial when owned by a public authority, for all tolls, whether high or low, go to the single purpose of liquidating the debt, after operating expenses and upkeep are provided for. If tolls are low, the public benefits in that way; if they are high, the debt is liquidated and the bridge made free at an earlier date. Of course, the price paid for the bridge, in the first instance, is of primary importance, but the fact that with all future contingencies discounted, it seems reasonable to assume that in any event the bridge can be paid for out of earnings within the life of the securities proposed to be issued therefor, argues strongly for a value equal to such securities.

In view of these considerations, we think the earnings of the bridge, based on reasonable tolls, considering the record of the past, and prospects for the future should be given great weight in ascertaining the value of the bridge. Satisfactory earnings give greater value to franchise and other rights of an intangible nature. That the growth and development of a community may enter into and increase this value is no different from increases in the value of other types of property, such as real estate in a growing city. Earnings, to a large degree, fix the market value of every public utility enterprise, and without earnings their assets have a greatly reduced value. We call attention to these obvious facts to show that the estimates of value placed on the Huntington bridge are not different from those placed on other classes of property, when value depends largely on earnings. The estimated cost of the bridge, when constructed in 1926, including the

new floor later laid, was approximately $985,000.00. Failure to collect tolls sufficient to provide for operation and upkeep would have resulted in a total loss of the investment, and this being true, if the actual returns from tolls, imposed at a reasonable rate, create a value double the original investment, should not weighty consideration be given thereto in fixing the present value of the bridge?

The learned trial judge refers to the profits which will accrue to the bridge company under the proposed sale. In any aspect of the case these profits are impressive. However, we do not think the value of the property in question should be determined in that way. So long as our present economic system continues, the right to make profits, even excessive profits, must be recognized. The value of property does not depend on what it costs but its real worth, and when we make this statement we refer to market value as distinguished from rate-making value. What is termed unearned increment, that is value "due to no labor or expenditure on the part of the owner, but to natural causes making an increased demand for it, such as the increase of population or the general progress of society" results in the creation of value in many cases where it approaches an unjust enrichment, but it is a value which must be recognized in law. We do not mean to say the present case is one of that type; it is rather a case where a group of far-seeing men saw the opportunity to make a fortunate investment, and the mere fact that it has resulted in enormous profits should not now be used as the basis for a charge of legal fraud when they seek to realize on the outcome of their business foresight. In any event, if profits are to be considered, the burden of taxation imposed by state and federal governments on a transaction of this character should not be ignored. The federal tax on the corporation alone, growing out of this sale, is estimated at approximately $360,000.00; and the tax which will be imposed by the taxing powers on individual profits accruing therefrom will add substantially to that figure. So that, while the profits are large, in reality they will be much lower than the figures used by the trial court indicate. Mention is

also made of the profits accruing to Cooper, who has an agreement with the bridge company to purchase the $2,000,000.00 bond issue for $1,815,922.50, which, if the bonds are sold at par, will result in a gross profit to him of $184,077.50. Admittedly, this is a substantial profit, but transactions of this character entail risks and expense. Be that as it may, the question of Cooper's profits is one which concerns, primarily, the bridge company, and the county court, with knowledge of Cooper's contract, as we interpret the record, so considered it, and we do not think it should have any substantial bearing on the question before us.

The question of the rate of interest on the proposed bond issue is raised. We think it will be admitted that bonds based upon particular property, and dependent for payment of principal and interest on the value and earnings of that property alone, cannot be sold at a rate of interest comparable to a bond legally issued which has back of it the taxing powers of the sovereignty, and is protected by provisions of both the state and federal Constitution. There is nothing in the record indicating that an issue of this character can be sold at a rate of interest more favorable to the county court, and nothing which convinces us that the court abused its discretion in this connection.

The appellees say that, "The bridge company is entitled to receive only a fair return on the fair value of its property after deducting expenses of operation, maintenance, taxes and a reasonable amount for depreciation and obsolescence", and cite *Charleston* v. *Public Service Com.,* 95 W. Va. 91, 120 S. E. 398, and *Charleston* v. *Public Service Com.,* 110 W. Va. 245, 159 S. E. 38, in support of their statement. Unquestionably the quotation states a sound principle when applied to rates, and is in accord with all the law governing the fixing of rates by a public utility. It would be useless to discuss at length the principles on which this rule is founded. Suffice it to say that, under the present state of the law, utilities are generally treated as monopolies, and regulated as such both as to the services required of them and as to the rates they may charge

therefor. Only property used and useful may be considered in fixing values, and rates are supposed to be fixed fairly as between the utility and the public, providing on the one hand a fair return on the investment, and on the other hand service at a reasonable cost. The rule in fixing value where property is taken under a condemnation proceeding, is quite different. In such cases physical property, franchise and contract rights, earnings, and all other matters legitimately affecting value are taken into consideration. *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463; *Omaha* v. *Omaha Water Co.,* 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; *Northern Pac. Ry. Co.* v. *North American Tel. Co.,* 230 Fed. 347, L. R. A. 1916E, 572; *Montgomery County* v. *Schuylkill Bridge Co.,* 110 Pa. 54, 20 Atl. 407; *State* v. *Suffield-Thompsonville Bridge Co.,* 82 Conn. 460, 74 Atl. 775; *In re Sunderland Bridge Case,* 122 Mass. 459; *Kennebec Water District* v. *Waterville,* 97 Me. 185, 54 Atl. 6, 60 L. R. A. 856; *Oshkosh Water Works Co.* v. *Railroad Commission,* 161 Wis. 122, 152 N. W. 859, L. R. A. 1916F, 592. We see no reason why the same rule should not apply in cases where property is acquired by contract, and where, for any reason, the price paid may be properly inquired into. Of course, where earnings are taken into consideration, it must be on the basis that the rates and tolls from which they are derived are reasonable, and the statement contained in *Davis* v. *Bridge Commission,* 113 W. Va. 110, 166 S. E. 819, 820, that "* * * the imposition of excessive tolls by a public utility does not add to the real worth of its property", whether or not *dicta,* is a correct statement of an economic fact; for with public utilities in general, and this case in particular, there exists a power whereby unreasonable tolls may be reduced, which in the ordinary case would serve to reduce earnings. Rates and tolls are not in all cases controlled by the cost or value of the property out of which they arise; they depend, to a certain degree, on current tolls or rates on other like enterprises within reasonable distances, and where the competitive element enters; and, as we have heretofore indicated, we cannot say that the tolls on the

Huntington bridge have been or are now unreasonable; nor, recognizing the right of the Secretary of War to regulate tolls thereon, can we say that there is a reasonable probability that any anticipated regulation of tolls will seriously affect bridge earnings.

The trial judge in his written opinion filed with the record says: "Measured by the yard stick of average earnings of the past five years bond brokers agree and the defendants have proved that $2,000,000.00 of bridge revenue bonds is not an excessive price for the bridge.", and then adds, "But, is this test of value the only one to be used by the county court which, if it has power to buy has power to condemn?" Answering this question, we say that earnings are not the only test but should be considered along with all other elements of value, and this we have endeavored to show is the rule which should be applied whether the property is acquired by contract or by condemnation. Applying this rule, and after due consideration of every factor entering into the problem before us, we have come to the conclusion that the county court did not abuse its discretion in agreeing to purchase the bridge in question at the price and on the terms proposed; and that the price paid therefor cannot be said to be so excessive as to convict the court of constructive fraud in agreeing thereto. Men may honestly differ as to whether the price paid was excessive. Mere excessiveness is not sufficient to convict of constructive fraud. Where there is room for honest differences of opinion, such as we think exists in this case, there cannot be a holding of fraud. The honest, though unwise, exercise of the discretion vested in a public official does not amount to constructive fraud, unless the effect thereof imposes a gross and unreasonable burden upon the public. In purchasing the Huntington and Ohio bridge, we do not believe the court abused its discretion to the extent of imposing on the public an unreasonable burden, giving consideration to all the elements of value and of public policy which, in our opinion, it was proper to consider.

We have not overlooked other points raised in the brief of the appellees. It is contended that the county court

did not have authority to purchase the bridge without the consent of the State Road Commission. To this we answer: The statute under which the purchase was made does not require such consent. It is further contended that the consent of the Public Service Commission to the sale was necessary. The bridge in question is not one over which the Commission has any control, and therefore the provisions of Code, 24-2-12, prohibiting certain public utilities "subject to the provisions of this chapter" from doing particular things do not apply. Then we have the situation created by the fact that under some arrangement between Cooper, the bridge company and The First Huntington National Bank, the bank is to be paid $5,000.00 for handling the transaction. One member of the county court is a director of the bank, but, at the time of the purchase of the bridge, had no knowledge of this arrangement. While the amount is small, considering the magnitude of the transaction, this point should not be ignored for that reason; but we think it would be unreasonable to hold that a member of the court could have been influenced by an agreement of which he had no knowledge. For that reason, and the further reason that the vote of this member of the court was not essential to the agreement, we do not feel that the after developed fact should be permitted to affect the validity thereof.

For the reasons stated above, we reverse the decree of the Circuit Court of Cabell County entered on the 7th day of October, 1940, and remand the cause for further proceedings.

*Reversed.*

LOVINS, JUDGE, dissenting:

The majority opinion states that the questions arising herein fall into three main points: "(1) Are the plaintiffs below entitled to maintain this suit; (2) has the county court legal authority to purchase and operate the bridge in question; and (3) if the power exists was the exercise thereof in this case tainted with such constructive or other fraud as will warrant us in voiding the sale and pur-

chase under investigation?" I shall endeavor to follow this outline in my note of dissent.

As to the first point, suffice it to say that I agree with the majority of the Court.

Coming to a discussion of the second point the following language appears in the majority opinion: "If, as the law was at the time Chapter 27 was enacted, the county court had no authority to purchase and operate a toll bridge, then to give the Act any effect whatever, we must hold that former acts have been superseded to the extent that they prevented the exercise of the power granted by the new statute." Chapter 27 did not, as I view it, take the place of any existing statute, but only gave to county courts and municipalities powers which they had not possessed prior to its enactment. This clearly appears from language appearing in the majority opinion subsequent to the sentence just quoted.

It is my belief that the provisions of Section 2, Chapter 27, Acts 2nd Ex. Sess. 1933, are clearly reconcilable with the prior enactment (Ch. 40, Ex. Sess., 1933) granting to the state road commissioner control and authority over the primary and secondary roads of this state, for the reason that a privately owned toll bridge by its very nature is not a part of such road system although physically it may constitute a link or connecting part thereof. I do not agree with the statement of the majority opinion that existing laws are superseded by Chapter 27 to the extent of the addition of a power not existing prior to its enactment. Consistent with the principles just stated, I agree with the conclusions stated in the majority opinion, but I do not agree with the reasons given therefor.

The majority opinion refers to the case of *Board of Education* v. *County Court,* 104 W. Va. 80, 138 S. E. 761, as illustrative of "an extreme case of inadequate price" citing the same to show "the reluctance of courts to hold fraudulent transactions involving discretion as to the price at which property is purchased or sold." In that case, the County Court of Wood County sold the capital stock in the Parkersburg-Ohio Bridge Company at an alleged inadequate price. (See the majority opinion for its dis-

cussion of that case and conclusions derived therefrom). In my mind, the Wood County case shows that this Court stands ready to scrutinize carefully such transactions and to protect citizens and taxpayers in matters involving the purchase and sale of property, in which the public has an interest, rather than an inclination to gloss over an irregular course of conduct by a county court, the result of which is to use money collected from the travelling public to purchase a bridge at a price approximately twice its replacement value. To that extent, I believe the case last cited to be misapplied by the majority opinion.

As to the third point, I am of the opinion that the circuit court was correct in finding that the action of the county court was constructively fraudulent.

The majority opinion takes up separately the following questions: (a) The haste in which the transaction was consummated; (b) the failure of the county court to consult its legal adviser, the prosecuting attorney, as to the legal aspects of the purchase of the bridge; and (c) the price and terms agreed upon, answering each contention of appellees in turn. In the determination of whether the conduct of a public body or a public official amounts to constructive fraud, I do not believe that the various factors which together compose the conduct of such body or official should be dealt with separately. It may be true that any one of the various considerations discussed in the able opinion prepared by Judge Fox scrutinized alone would not sustain the charge of constructive fraud, however, their composite result in my opinion is controlling and when thus examined it is plain that the sum total of their effect tends to injure the public interest and violates a confidence and a trust. I am of the opinion that all of the series of events and acts which constitute a course of conduct should be examined and appraised as a whole. *Moore* v. *Gregory,* 146 Va. 504, 131 S. E. 692; *Hulings* v. *Lumber Co.,* 38 W. Va. 351, 18 S. E. 620.

As stated in *Leader Pub. Co.* v. *Trust Co.,* 182 Ind. 651, 108 N. E. 121, 124: "Constructive fraud, or legal fraud, arises by acts or course of conduct which, if sanctioned by law, would, either in the particular case or in common ex-

perience, secure an unconscionable advantage, irrespective of the existence of evidence of actual intent to defraud. * * * Fraud in law is what the law condemns, from all the facts and circumstances surrounding a transaction and is synonymous with constructive fraud." So, to use the language of the Indiana case, just referred to, it is the series of acts or course of conduct and all the facts and circumstances surrounding the transaction here involved that I have considered in determining that the existence of constructive fraud has been shown here.

I agree with the majority of the Court in its conclusion that the manner in which the meeting of the board of directors was held for the purpose of preparing the offer to be submitted to the county court on the following day should have no bearing upon the decision herein. My disagreement with the majority's conclusion begins with the presentation of the offer.

The majority opinion asks: "Should the county court have taken the matter under consideration, given it publicity and invited public discussion and advice?" While not impressed with the last portions of the question propounded, I do believe that full consideration of the matter should have been undertaken by the county court and that the thirty minute executive session could not have afforded that consideration, an integral part of which certainly was the seeking of advice from the prosecuting attorney. Should not some further information have been sought in regard to the present value, replacement value and cost of repairs and future income? A matter of this magnitude requires that there should be a careful, searching investigation of all the facts, and due deliberation thereon,—especially is this true where the financial interest of the public is involved and there is a fiduciary relationship existing as between the County Court of Cabell County and the taxpayers, citizens and the travelling public generally. The members of the county court are not expert in the intricacies of the law and the difficult problems of structural engineering. The majority opinion recites that the county court was justified in purchasing without delay by the considerations that the

bridge is located almost wholly in Cabell County, that local effort and capital built it, that its object is the promotion of Huntington, which is the magnet for the use of the bridge, and pride in the ownership of a traffic artery so that future control would not be in the State of Ohio. Are these valid reasons? It may be that they should be so regarded in the marts of trade and in the market place, but they have no place in the agencies of government and the deliberations of a body controlling the fiscal policies of a county.

Regardless of the demands of provincialism and the so-called necessities of expediency the stark fact remains that the travelling public is called upon to pay almost twice the actual replacement cost of the bridge. There is an attempt to justify this unusual conduct on the ground that future income constitutes an important element of value. The income from the bridge comes entirely from tolls, and while I readily concede that the right to take tolls for the use of the bridge has a substantial value and should be given fullest consideration in arriving at a sales price, yet a value of approximately $1,000,000.00 seems to be entirely too high. Future income is uncertain and of such a speculative nature that value based thereon can not, with justice, be accorded such weight.

The majority opinion states, in effect, that there is one value for rate-making purposes and another value for the purpose of condemnation or purchase. Since the entire income is derived from tolls, I fail to see any reason for this distinction. The value for rate-making purposes controls the income to be derived from the bridge. Since almost one-half the purchase price is based on future income, it is only logical to say that the value for rate-making purposes is a true basis—at least in this instance—for appraising the bridge property in so far as the purchase price is in excess of the value of tangible property.

The amount paid for the bridge is controlling in this controversy. Low or high tolls only determine the time of payment and not the amount. To my mind it is wholly illogical to attempt to justify the high price paid by saying that high tolls will make the bridge free in a short time,

or low tolls will react to the benefit of the public over a longer period. In any event, the travelling public will be required to pay two million dollars, for a property which can be replaced for $1,143,400.00, to use the highest estimate appearing in the record.

The offer made by Somerville is accepted as being of evidentiary value. No inquiry is made as to the capacity of the offerer to make his offer good. The fact that Somerville is connected with a bank is mentioned in the majority opinion—this connection alone is not sufficient to establish the *bona fides* of the offer made by him nor does it show his capacity to carry out the terms thereof.

In *Davis* v. *Bridge Commission,* cited in the majority opinion, this Court said: "The allegations of secret purchase at $325,000.00 of an antiquated and inconvenient bridge costing only $42,000 a quarter of a century ago, and upon which $55,000 must be spent for immediate repairs, when a modern, adequate and convenient structure could be built for $160,000.00, make a sufficient charge of constructive fraud." As to the annual average of $60,000.00 in tolls, the Court said: "the imposition of excessive tolls by a public utility does not add to the real worth of its property". I do not assert that excessiveness of price stands out as clearly in the case at bar as in the *Davis* case, but it is merely a question of degree and I believe that the sound, moral principal enunciated in the *Davis* case applies with equal force to the facts established in this case. Although it may be said that the statements quoted from the *Davis* case are mere *dicta,* who can gainsay that they meet the highest requirements of morality, diligence, forethought, sound public policy and correct business principles in dealing with public finances. I believe that the majority opinion does violence to these principles.

What of the weight to be accorded a finding of fact by a trial chancellor upon conflicting facts adduced before him? Should this principle, long established in this and other jurisdictions, be ignored in this case? "The findings of fact of the trial chancellor will not be disturbed on appeal unless at variance with undisputed evidence or contrary to the plain preponderance of the whole evidence."

*Hatten* v. *Hatten,* 110 W. Va. 208, 157 S. E. 582. See *Board of Commissioners* v. *Mining Co.,* 122 W. Va. 442, 9 S. E. (2d) 813 for a late enunciation of this rule.

Finally, I wish to refer to what I term, the "apologetic attitude" of the majority opinion, in its discussion of the activities of the County Court of Cabell County surrounding this bridge purchase. The keynote of this "apologetic attitude" is sounded with this sentence: "It is apparent that agreements involving public interests of the magnitude of those being considered are not ordinarily entered into under conditions such as those surrounding the execution of the sale and purchase under attack." Further, it is said that this was not an ordinary transaction. In my opinion, this shows a disposition to relax the ordinarily stringent rules and principles surrounding the activities of public bodies possessed of fiduciary character. Why should any excuses be made for the actions of such public bodies, unless the purpose be to cover some illegal act? I look with abhorrence upon such elastic—and I say elastic because any transaction is capable of being labeled as out of the ordinary—treatment of the rules governing the acts of public bodies while the public is blissfully unaware that their interests are so subverted.

For the reasons herein stated I would affirm the decree of the trial court.